Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
08/07/2026 08:10 AM CDT

Jami L. Roth, now known as Jami L.
Sunde, appellee, v. Kristopher P.
Marcoe, appellant.
___ N.W.3d ___

Filed August 7, 2026.    No. S-25-697.

1. **Parental Rights: Judgments: Appeal and Error.** Termination of parental rights cases raised under Neb. Rev. Stat. § 42-364(5) (Cum. Supp. 2024) are reviewed de novo on the record, and an appellate court is required to reach a conclusion independent of the lower court's findings.
2. **Evidence: Appeal and Error.** When the evidence is in conflict, the appellate court will consider and give weight to the fact that the lower court observed the witnesses and accepted one version of the facts over the other.
3. **Contempt: Appeal and Error.** In a civil contempt proceeding where a party seeks remedial relief for an alleged violation of a court order, an appellate court employs a three-part standard of review in which (1) the trial court's resolution of issues of law is reviewed de novo, (2) the trial court's factual findings are reviewed for clear error, and (3) the trial court's determinations of whether a party is in contempt and of the sanction to be imposed are reviewed for abuse of discretion.
4. **Parental Rights: Proof.** In order to terminate parental rights, a court must find by clear and convincing evidence that one of the statutory grounds enumerated in Neb. Rev. Stat. § 43-292 (Reissue 2016) exists and that the termination is in the child's best interests.
5. **Parental Rights: Abandonment: Words and Phrases.** For purposes of Neb. Rev. Stat. § 43-292(1) (Reissue 2016), "abandonment" is a parent's intentionally withholding from a child, without just cause or excuse, the parent's presence, care, love, protection, maintenance, and the opportunity for the display of parental affection for the child.
6. **Parental Rights: Abandonment: Proof.** To prove abandonment in determining whether parental rights should be terminated, the evidence

must clearly and convincingly show that the parent has acted toward the child in a manner evidencing a settled purpose to be rid of all parental obligations and to forgo all parental rights, together with a complete repudiation of parenthood and an abandonment of parental rights and responsibilities.

7. **Parental Rights: Abandonment: Time: Intent.** A court reviewing a termination of parental rights case on the ground of abandonment need not consider the 6-month period in a vacuum. Instead, the court may consider evidence of a parent's conduct, either before or after the statutory period, in determining whether the purpose and intent of the parent was to abandon his or her children.

8. **Parental Rights.** Whereas the statutory grounds for termination of parental rights are based on a parent's past conduct, the best interests inquiry focuses on the future well-being of the child.

9. **Constitutional Law: Due Process: Parental Rights: Proof.** Showing that termination of parental rights is in the best interests of the child is necessarily a particularly high bar, since a parent's right to raise his or her children is constitutionally protected. The Due Process Clause of the U.S. Constitution would be offended if a state were to attempt to force the breakup of a natural family, over the objections of the parents and their children, without some showing of unfitness.

10. **Parental Rights: Presumptions.** There is a rebuttable presumption that it is in the child's best interests to share a relationship with his or her parent.

11. **Parental Rights: Presumptions: Proof.** The presumption that it is in the child's best interests to share a relationship with his or her parent can only be overcome by a showing that the parent is either unfit to perform the duties imposed by the relationship or has forfeited that right.

12. **Parental Rights: Statutes: Words and Phrases.** Although the term "unfitness" is not expressly stated in Neb. Rev. Stat. § 43-292 (Reissue 2016), it derives from the fault and neglect subsections of that statute and from an assessment of the child's best interests.

13. **Parental Rights: Words and Phrases.** Parental unfitness means a personal deficiency or incapacity that has prevented, or will probably prevent, performance of a reasonable parental obligation in child rearing and that has caused, or probably will result in, detriment to a child's well-being.

14. **Parental Rights.** The best interests and parental unfitness analyses in the context of a termination of parental rights case require separate, fact-intensive inquiries, but each examines essentially the same underlying facts.

Appeal from the District Court for Seward County: Jᴀᴍᴇs C. Sᴛᴇᴄᴋᴇʀ, Judge. Affirmed.

Angelica W. McClure, of Kotik & McClure Law, for appellant.

Megan E. McDowell and Terrance A. Poppe, of Morrow, Poppe, Watermeier & Lonowski, P.C., L.L.O., for appellee.

Fᴜɴᴋᴇ, C.J., Cᴀssᴇʟ, Sᴛᴀᴄʏ, Pᴀᴘɪᴋ, Fʀᴇᴜᴅᴇɴʙᴇʀɢ, Bᴇʀɢᴇᴠɪɴ, and Vᴀᴜɢʜɴ, JJ.

Fᴜɴᴋᴇ, C.J.

## I. INTRODUCTION

Kristopher P. Marcoe appeals the order of the district court for Seward County, Nebraska, terminating his parental rights to two minor children. Marcoe claims that the district court erred in hearing the case to terminate his parental rights and not transferring it to the county court for Seward County, sitting as a juvenile court, because there was no "specific finding" under Neb. Rev. Stat. § 42-364(5) (Cum. Supp. 2024) that the district court was the more appropriate forum.[1] Marcoe also claims that the district court erred in terminating his parental rights, in not modifying custody as an alternative to termination, and in vacating his request for a contempt citation against the children's mother, Jami L. Roth, now known as Jami L. Sunde (Sunde). Because those arguments are meritless or moot, we affirm the order of the district court.

## II. BACKGROUND

### 1. Fᴀᴄᴛᴜᴀʟ Bᴀᴄᴋɢʀᴏᴜɴᴅ

Marcoe and Sunde met in 2009 and became romantically involved in or around 2010. By the time the parties met, Marcoe had been convicted of multiple criminal offenses,[2]

---

[1] Brief for appellant at 21.

[2] See *State v. Marcoe*, No. A-23-721, 2024 WL 2010464 (Neb. App. May 7, 2024) (selected for posting to court website).

although they later disputed whether Sunde was aware of Marcoe's criminal history when they became involved. Some of Marcoe's offenses involved drugs or alcohol,[3] and he subsequently admitted that he used methamphetamines and marijuana between 2010 and 2023.

During their relationship, Marcoe and Sunde had a daughter, born in 2011, and a son, born in 2016. Marcoe was convicted of additional offenses during that period,[4] and Sunde does not dispute that she "learn[ed] about some [of Marcoe's] criminal history" then.

The parties ended their relationship in 2016, and in 2018, the district court entered a paternity decree awarding Sunde legal and physical custody of the children subject to Marcoe's parenting time. Marcoe was given regular parenting time every other weekend during the school year and every other week during the summer, as well as specified holidays. He was required to pay $594 per month in child support for the two children.

In 2019, the district court modified the paternity decree to allow Sunde to remove the children to North Dakota. At that time, the parenting plan was also amended to prescribe that upon notice, Marcoe was required to submit to a hair follicle test to determine whether he was using any illegal drugs and that his parenting time would be suspended if he refused to take such a test or if he tested positive for illegal drugs. In addition, Marcoe's parenting time was amended to allow him specified holidays, a month of parenting time in June or July of alternate years, and one weekend of parenting time in any month when he did not otherwise exercise parenting time, provided that he gave Sunde advance notice and that his parenting time did not conflict with her holiday parenting time. Marcoe's child support was reduced to $300 per month for the

---

[3] See *id.*

[4] See *id.*

two children in part because he was solely responsible for the costs of transportation for his weekend parenting time.

In July 2020, the court suspended Marcoe's in-person parenting time until he provided a negative hair follicle test to Sunde. Marcoe was allowed weekly "telephone/video chat communication" with the children for up to 30 minutes per week.

In March 2023, the court issued a purge order, finding Marcoe in willful and contumacious contempt for failing to pay child support and directing him to pay his current child support obligation, as well as at least $50 of his child support arrears each month for 18 months, or be imprisoned. However, Sunde's subsequent request for a bench warrant was dismissed in October 2023, because the court found that Marcoe had "substantially complied" with the purge order.

In the time between the entry of the paternity decree and the issuance of the purge order, Marcoe was convicted of additional offenses.[5] One of those convictions resulted in Marcoe's being imprisoned from August 2023 to August 2024.

## 2. SUNDE'S COMPLAINT AND MARCOE'S ANSWER

On May 15, 2024, while Marcoe was in prison, Sunde filed a complaint to terminate his parental rights. The complaint noted multiple grounds for termination under Neb. Rev. Stat. § 43-292 (Reissue 2016), including that Marcoe had abandoned the children for 6 months or more immediately before the complaint was filed and had substantially and continuously or repeatedly neglected and refused to give the children necessary parental care and protection.

Counsel was appointed for Marcoe, and Marcoe filed an answer, in which he admitted having been convicted of specific criminal offenses. He denied the remainder of Sunde's allegations.

Preparations were made for a trial, and a trial date was set.

---

[5] See *id.*

### 3. Marcoe's Motion for Contempt Citation

After the trial date was set, Marcoe requested a contempt citation against Sunde for failing to permit him to have weekly "telephone/video chat communication with the minor children" and not providing him any way to contact the children. Marcoe also alleged that he provided Sunde with a negative hair follicle test on December 19, 2024, but that she "responded through counsel that she [would] not agree to allow [him] to resume his parenting time." The court entered a citation to show cause, setting the matter for a hearing at the same time as the trial on the complaint to terminate Marcoe's parental rights. Sunde denied the allegations.

### 4. Evidence at Trial

A trial was held on Sunde's complaint to terminate Marcoe's parental rights and Marcoe's request for a contempt citation against Sunde. The evidence at the trial is summarized below as it relates to the parties' claims on appeal. Additional evidence is discussed later in the opinion insofar as it pertains to our analysis of those claims.

The evidence at the trial undisputedly showed that Marcoe had no contact with the children in the 6 months immediately before the complaint to terminate his parental rights was filed. However, there was conflicting testimony regarding the reasons why Marcoe had no contact with the children during that 6-month period, his exercise or attempts to exercise parenting time before and after the relevant 6-month period, and his personal improvements while in prison.

### (a) Reasons for No Visitation or Contact During 6-Month Period

Marcoe gave varying accounts of his actions during the 6-month period immediately before Sunde filed her complaint—a period during which he was in prison, as noted above. Initially, Marcoe said that during this period, he did not call, write, or text Sunde to request parenting time because he did not have her telephone number or address and

cell phones are not allowed in prison. He similarly said that he did not ask the court for assistance in arranging visitation because that is "pretty difficult to do" while in prison and that he did not ask the children's school for information because he "was not able to contact" the school. Later, he said that he did attempt to call the children, but that he got no response because he did not have the correct telephone number. He similarly said that he texted Sunde and that he "believe[d]" his counsel at the time filed a motion asking for the court's assistance in arranging visitation. However, Marcoe did not dispute that the record showed no such motion, and no copies of those text messages were offered into evidence despite his claim that he believed his attorney had them.

Sunde, in turn, said that she and her husband did not receive "any communication" of any type from Marcoe during the relevant 6-month period. Sunde admitted that she "changed [her] phone number" in or around June 2023 and that she did not give the new number to Marcoe. Initially, Sunde said that she failed to do so because she "hadn't talked to him or heard from him" and "[i]t just slipped [her] mind." Later, she said that she did not give Marcoe her new number to avoid receiving what she perceived to be messages left by Marcoe while he was on drugs. However, Sunde said that she was not "trying to hide" her new number from Marcoe and that several members of Marcoe's family had her new number. Otherwise, Sunde and her husband both testified that her email address, her husband's telephone number, and the couple's address remained unchanged throughout the relevant period.

### (b) Contact With Children Before and
### After Relevant 6-Month Period

Marcoe and Sunde agreed that it had been at least 4½ years since he had in-person visitation with the children. Marcoe said that his last in-person visitation was around Christmas 2020. Sunde said that it was 2019, but otherwise agreed that Marcoe's last visitation with the children was around

Christmas. There was also some indication that after the last in-person visitation in 2019 or 2020, Marcoe and the children spoke by telephone or videoconference. However, there was no evidence of the frequency or nature of those conversations, and Marcoe said that this contact ended in March 2021 after a conversation between him and the parties' daughter. Sunde agreed with Marcoe that the calls ceased after the daughter told Marcoe that "she didn't want to talk to him," but Sunde said that this conversation occurred in March 2022, and not March 2021, as Marcoe claimed.

Marcoe said that even after the conversation with the parties' daughter, he "continued to call every Sunday at 6:30 [p.m.]," but that his calls were "ignored" and his messages went unanswered. Marcoe also said that there were "several" instances over the past 5 years where Sunde had "intentionally withheld" the children from him. In particular, Marcoe recounted one occasion in October 2022 when he and his parents drove to North Dakota to see the children at school but discovered that the children had been removed from the school shortly before he and his parents arrived. Further, Marcoe said that after his release from prison, he continued to call and text Sunde at her former telephone number until he got her current number from the school. However, according to Marcoe, even after he had the correct number and obtained a negative hair follicle test, he was not allowed contact with the children or given the requested information about them.

Sunde agreed that Marcoe continued to call after the parties' daughter said that she did not wish to speak with him. However, Sunde said that Marcoe called monthly, not weekly, and that his calls ceased in April or May 2023. According to Sunde, Marcoe was not allowed in-person visitation with the children in late 2022 because he had not provided notice of his intent to exercise his parenting time or a negative hair follicle test, as required under prior court orders. Furthermore, Sunde said that Marcoe's in-person visitation with the children prior to Christmas 2019 or 2020 had been inconsistent and that he

was "[a]bsent" and left the children with his mother during his parenting time. As to the period after Marcoe's release from prison, Sunde did not dispute that she denied Marcoe's request for in-person visitation in December 2024, but she said that she did not believe she was in contempt in so doing because she had an obligation to protect the children. Sunde also noted that Marcoe did not produce a negative hair follicle test, request their daughter's sports schedules, or pay child support until after the complaint for termination was filed.

(c) Marcoe's Alleged Changes While in Prison

Marcoe presented evidence that he had "changed" during his time in prison. Marcoe testified that he had not used drugs or alcohol since August 21, 2023, and that while in prison, he participated in a substance abuse support group and completed multiple self-improvement courses. Marcoe and his witnesses also testified that since his release from prison, he had participated in therapy and a substance abuse support group, complied with the drug-testing requirements of his post-release supervision, and never tested positive for illegal drugs. The officer overseeing Marcoe's post-release supervision said that she viewed him as a "leader on [her] case load" in terms of building a support network and that she referred other clients who were "struggling with . . . addiction" to him for help in finding someone to address that issue and "get them to meetings." Marcoe's sponsor in the substance abuse support group and a long-time friend similarly said that Marcoe was more "empathetic" and "compassionate" and "more attentive with family matters" since his time in prison.

On the other hand, there was evidence that Marcoe's chosen sobriety date (as to both drugs and alcohol) was a date when he was in jail immediately before starting his prison sentence and that since that date, he had not yet been substance-free while not also in prison or on post-release supervision. In addition, there was evidence that Marcoe had completed rehabilitation at least once before and relapsed after 18 months. Sunde

testified that she believed Marcoe was substance-free only because it was a condition of his post-release supervision and that there was nothing he could do to convince her that he no longer used drugs.

### (d) Daughter's Testimony

The parties' daughter, then 14 years old, testified in camera. Although the parties discuss her testimony in their briefs on appeal, we note it only obliquely here to protect her privacy.

### 5. District Court's Order

After the hearing, the district court issued an order terminating Marcoe's parental rights. The court found that Sunde had shown by clear and convincing evidence that Marcoe had abandoned the children for a period of 6 months or more before the complaint to terminate his parental rights was filed and that it was in the children's best interests that his parental rights be terminated. The court acknowledged Marcoe's claim that the "interruption in [his] parenting time was due to his incarceration and that his parental rights cannot and should not be terminated as a result of his incarceration." However, the court said that the evidence showed that Marcoe's abandonment of the children had preceded his incarceration and continued after his release. In particular, the court pointed to evidence that in the 6 months before the complaint for termination was filed, Marcoe did not exercise or request any parenting time, did not file an action to compel parenting time, did not contact the minor children or Sunde's husband, and did not pay any child support. The court also observed that after his release from prison, Marcoe did not submit a negative hair follicle test until December 19, 2024, and did not pay any child support until February 9, 2025.

As to Marcoe's request for a contempt citation, the court found that Sunde was not in willful and contumacious contempt of the court's prior orders. Instead, the court said that for nearly 4½ years after Marcoe's parenting time was suspended,

he failed to submit a negative hair follicle test and, thus, had no in-person parenting time. The court also observed that while Marcoe had asked for parenting time for the month of July 2025, he did not fault Sunde for not allowing him the requested time because he had not had contact for the children for so long. As such, the court concluded that Marcoe had not met his burden of proof that Sunde was in contempt of the court's prior orders.

## III. ASSIGNMENTS OF ERROR

Marcoe assigns, restated and consolidated, that the district court erred in (1) not transferring the matter to the juvenile court, (2) terminating his parental rights and not modifying custody as an alternative to termination, and (3) vacating his request for a contempt citation.

## IV. STANDARD OF REVIEW

[1,2] Termination of parental rights cases raised under § 42-364(5) are reviewed de novo on the record, and an appellate court is required to reach a conclusion independent of the lower court's findings.[6] However, when the evidence is in conflict, the appellate court will consider and give weight to the fact that the lower court observed the witnesses and accepted one version of the facts over the other.[7]

[3] In a civil contempt proceeding where a party seeks remedial relief for an alleged violation of a court order, an appellate court employs a three-part standard of review in which (1) the trial court's resolution of issues of law is reviewed de novo, (2) the trial court's factual findings are reviewed for clear error, and (3) the trial court's determinations of whether a party is in contempt and of the sanction to be imposed are reviewed for abuse of discretion.[8]

---

[6] *Benjamin S. v. Crystal S.*, 313 Neb. 799, 986 N.W.2d 492 (2023).

[7] *Id*.

[8] *Leaf Supreme Prods. v. Bachman*, 318 Neb. 751, 18 N.W.3d 564 (2025).

## V. ANALYSIS

### 1. DISTRICT COURT'S HEARING TERMINATION CASE
### INSTEAD OF TRANSFERRING TO JUVENILE COURT

Marcoe claims that the district court erred in hearing the case regarding the termination of his parental rights instead of transferring it to the county court of Seward County, sitting as a juvenile court. In so arguing, Marcoe relies on § 42-364(5), which prescribes, in relevant part:

> Whenever termination of parental rights is placed in issue the court shall transfer jurisdiction to a juvenile court established pursuant to the Nebraska Juvenile Code unless a showing is made that the county court or district court is a more appropriate forum. In making such determination, the court may consider such factors as cost to the parties, undue delay, congestion of trial dockets, and relative resources available for investigative and supervisory assistance.

Marcoe claims that the necessary "finding" that the district court was the more appropriate forum was not made here,[9] because there was no hearing on that question and, thus, there is "absolutely no evidence in the record" to show why the district court believed it was the more appropriate forum.[10] Marcoe also argues that the juvenile court was the more appropriate forum in part because of its familiarity with termination of parental rights cases and its experience in handling the testimony of minors.

Sunde counters that the district court did not err in hearing the termination case against Marcoe instead of transferring it to the juvenile court. Sunde argues that under *Joyce S. v. Frank S.*,[11] "[t]here is no requirement for the district court to make 'express findings with regard to its determination that

---

[9] Brief for appellant at 22.

[10] *Id*. at 23.

[11] *Joyce S. v. Frank S.*, 6 Neb. App. 23, 571 N.W.2d 801 (1997), *disapproved on other grounds, Betz v. Betz*, 254 Neb. 341, 575 N.W.2d 406 (1998).

the case should proceed in district court.'"[12] Instead, Sunde suggests that under *Joyce S.* and related cases,[13] the district court's decision to hear that case was tantamount to a determination that the district court was the more appropriate forum. Sunde also observes that neither party requested a hearing on which court was the more appropriate forum or otherwise put the issue before the district court. In addition, Sunde claims that the district court was the most appropriate forum because it "ha[d] made every decision in this . . . case . . . for more than [8] years."[14]

We agree with Sunde that consistent with the Nebraska Court of Appeals' opinion in *Joyce S.* and our own opinion in *R.D.N. v. T.N.*,[15] the district court did not err in hearing the case to terminate Marcoe's parental rights instead of transferring it to the county court for Seward County, sitting as a juvenile court.

In *Joyce S.*, the Court of Appeals raised the question of whether the district court had jurisdiction to hear the case where "neither the transcript nor the bill of exceptions contain[ed] a clear finding by the district court [that it was the more appropriate forum] as required by statute in order for the district court to retain jurisdiction of the termination proceedings."[16] The Court of Appeals stated that the "only indication" that the trial court may have made the necessary findings was contained in a journal entry that stated, "'[t]he parties have stipulated, and the [c]ourt has previously

---

[12] Brief for appellee at 14-15.

[13] See *Floerchinger v. Floerchinger*, 24 Neb. App. 120, 883 N.W.2d 419 (2016) (considering mother's approval of dissolution decree as evidence that district court's exercise of initial jurisdiction was in child's best interests).

[14] Brief for appellee at 16.

[15] *R.D.N. v. T.N.*, 218 Neb. 830, 359 N.W.2d 777 (1984), *disapproved on other grounds, Gibilisco v. Gibilisco*, 263 Neb. 27, 637 N.W.2d 898 (2002).

[16] *Joyce S., supra* note 11, 6 Neb. App. at 26, 571 N.W.2d at 805.

determined, that this action should proceed in [d]istrict [c]ourt rather than in [j]uvenile [c]ourt . . . .'"[17] The Court of Appeals then noted that the parties cannot confer subject matter jurisdiction upon the court by consent or acquiescence.[18] However, the Court of Appeals concluded that the evidence in that case would have "support[ed] a finding by the trial court that the factors prescribed by [the predecessor to the current § 42-364(5)] exist[ed] and that the district court was the more appropriate forum."[19]

Similarly, in *R.D.N.*, we rejected the appellants' contention that the district court did not have jurisdiction to terminate their parental rights. In so doing, we stated that it was "apparent from the record" that the district court was the more appropriate forum.[20] Specifically, we reasoned that "[i]n light of the 10 years of proceedings before the district court, it would be unreasonable to conclude that the district court should not have retained jurisdiction of the application" to terminate the appellants' parental rights.[21]

Under the reasoning of *Joyce S.* and *R.D.N.*, the evidence in the record here supports the conclusion that the district court was the more appropriate forum. As Sunde notes, there had been over 7 years of proceedings in the district court by the time the district court heard the trial on the termination of Marcoe's parental rights. Also, as discussed below, the district court had previously made findings that are relevant to the present matter, most notably the finding that "Marcoe relie[d] heavily on his parents to care for the children during his parenting time."

We would further note that Marcoe does not allege that he filed a motion asking the district court to determine if it was

---

[17] *Id.*

[18] *Id.*

[19] *Id.* at 26-27, 571 N.W.2d at 805.

[20] *R.D.N., supra* note 15, 218 Neb. at 836, 359 N.W.2d at 781.

[21] *Id.* at 837, 359 N.W.2d at 781.

the more appropriate forum or transfer the case to the juvenile court or that he otherwise raised the issue with the district court. Nebraska courts have historically taken the view that such a motion is required under § 42-364.[22] We understand those opinions to reflect, at least in part, the view that one cannot silently tolerate error, gamble on a favorable result, and then complain that one guessed wrong.[23]

## 2. Terminating Marcoe's Parental Rights and Not Modifying Custody as Alternative to Termination

[4] Marcoe also claims that the district court erred in terminating his parental rights. In order to terminate parental rights, a court must find by clear and convincing evidence that one of the statutory grounds enumerated in § 43-292 exists and that the termination is in the child's best interests.[24] Clear and convincing evidence is that amount of evidence which produces in the trier of fact a firm belief or conviction about the existence of a fact to be proved.[25] Marcoe argues that the evidence here failed to show either that there were grounds for termination or that termination was in the children's best interests. Sunde disagrees. Ultimately, for the reasons set forth below, we agree with Sunde that the district court

---

[22] See, *Worm v. Worm*, 6 Neb. App. 241, 573 N.W.2d 148 (1997); *Wright v. Wright*, No. A-00-1142, 2002 WL 75759 (Neb. App. Jan. 22, 2002) (not designated for permanent publication). See, also, *Dunham v. Dunham*, 34 Neb. App. 235, 34 N.W.3d 719 (2026) (mother requested her petition be transferred to separate juvenile court); *Kitsmiller v. Kitsmiller*, 31 Neb. App. 473, 983 N.W.2d 147 (2022) (father filed motion for determination of appropriate forum); *In re Interest of Afiniti R.*, No. A-22-453, 2023 WL 2377046 (Neb. App. Mar. 7, 2023) (selected for posting to court website) (mother moved to have jurisdiction accepted by district court).

[23] See *132 Ventures v. Active Spine Physical Therapy*, 318 Neb. 64, 13 N.W.3d 441 (2024).

[24] *In re Interest of Alec S.*, 294 Neb. 784, 884 N.W.2d 701 (2016). See, also, *Benjamin S., supra* note 6.

[25] *State v. Barnes*, 317 Neb. 517, 10 N.W.3d 716 (2024).

did not err in concluding that she met her burden to prove
Marcoe's parental rights should be terminated.

(a) Whether There Were Grounds for Termination

The district court concluded that there was ground for ter-
mination under § 43-292(1), because it found that there was
clear and convincing evidence Marcoe abandoned the chil-
dren for 6 months or more immediately before the complaint
for termination was filed. The parties' arguments also center
upon § 43-292(1). As such, we begin our discussion with that
provision.

[5-7] For purposes of § 43-292(1), "abandonment" is a
parent's intentionally withholding from a child, without just
cause or excuse, the parent's presence, care, love, protec-
tion, maintenance, and the opportunity for the display of
parental affection for the child.[26] To prove abandonment in
determining whether parental rights should be terminated,
the evidence must clearly and convincingly show that the
parent has acted toward the child in a manner evidencing a
settled purpose to be rid of all parental obligations and to
forgo all parental rights, together with a complete repudia-
tion of parenthood and an abandonment of parental rights and
responsibilities.[27] The time period for calculating the 6-month
period of abandonment specified in § 43-292(1) is determined
by counting back 6 months from the date the juvenile peti-
tion was filed.[28] However, a court reviewing a termination of
parental rights case on the ground of abandonment need not
consider the 6-month period in a vacuum.[29] Instead, the court
may consider evidence of a parent's conduct, either before or
after the statutory period, in determining whether the purpose

---

[26] *In re Interest of Isabel P. et al.*, 293 Neb. 62, 875 N.W.2d 848 (2016).

[27] *Id.*

[28] *Kenneth C. v. Lacie H.*, 286 Neb. 799, 839 N.W.2d 305 (2013).

[29] *In re Interest of Isabel P. et al., supra* note 26.

and intent of the parent was to abandon his or her children,[30] as the district court did here.

Based on the record before us, we agree with Sunde that the district court did not err in concluding that there was clear and convincing evidence Marcoe abandoned the children for purposes of § 43-292(1). In arguing otherwise, Marcoe does not dispute that he did not have any contact with the children in the 6 months immediately before the complaint to terminate his parental rights was filed. Instead, he essentially argues that his lack of contact with the children during that 6-month period was due to Sunde's failure to provide him with up-to-date contact information and his incarceration. However, as set forth above, there was conflicting testimony about whether Marcoe could have contacted Sunde, her husband, or the children while in prison. Marcoe testified that he did not have Sunde's telephone number or address, by which we understand him to mean her current telephone number and address.[31] However, Sunde testified that while she failed to inform Marcoe when she changed her telephone number in or around June 2023 (several months before he was incarcerated), her residential and email addresses and her husband's telephone number remained unchanged, and several members of Marcoe's family had her new number. The district court heard this testimony and impliedly found Sunde to be credible. Under the standard of review set forth above, we give deference to that determination.

We also reject any suggestion that Sunde's failure to provide Marcoe with up-to-date contact information or Marcoe's imprisonment would somehow excuse any failure to contact or attempt to contact the children during the relevant 6-month period. Previously, in a memorandum opinion, the Court of

---

[30] *Id.*

[31] See brief for appellant at 26 (claiming Sunde "changed her phone number and address and refused to provide those to [Marcoe]").

Appeals rejected a father's claim that he had not contacted his children for nearly 2 years because the children's mother failed to notify him of their move.[32] In so doing, the Court of Appeals stated that there were "a variety of actions" that the father could have taken to "discover [the children's] location."[33] We take a similar view here. Most notably, Marcoe could have moved the court for assistance in contacting the children. However, Marcoe's testimony regarding whether he filed such a motion was inconsistent, and he ultimately did not dispute that the record reflected no such motion had been filed. Likewise, we have previously stated that while incarceration alone is not a basis for termination of parental rights, "incarceration does not insulate an inmate from the termination of his or her parental rights if the record contains the clear and convincing evidence that would support the termination of the rights of any other parent."[34]

Nor are we persuaded by Marcoe's claim that the evidence shows that *prior* to the relevant 6-month period, Sunde kept him from having contact with the children, instead of his abandoning them. To be sure, Marcoe did testify that after the parties' daughter declined to speak with him in March 2021 or 2022, he continued to call every Sunday, but his messages were "ignored." However, there was no evidence of the frequency of Marcoe's calls between when his in-person parenting time was suspended in July 2020 and the daughter's refusal to speak with him in March 2021 or 2022, there was conflicting evidence about the frequency of his calls after March 2021 or 2022, and there was evidence that he ceased calling either in April or May 2023 or when he was incarcerated in August 2023.

---

[32] See *In re Interest of R.T. & A.T.*, Nos. A-23-806, A-23-808, 2024 WL 4355594 (Neb. App. Oct. 1, 2024) (selected for posting to court website).

[33] *Id.* at *8.

[34] See *In re Interest of Gabriella H.*, 289 Neb. 323, 333, 855 N.W.2d 368, 376 (2014).

The evidence of Marcoe's in-person contact with the children prior to November 2023 is even more scant. This evidence shows that Marcoe had in-person visitation with the children only twice after they moved to North Dakota, that he failed to comply with the court orders when attempting to visit the children in October 2022, and that Sunde did not receive a negative hair follicle test from him—as was required for him to resume in-person visitation—until December 2024.

In short, the record reflects "'sporadic, insubstantial efforts'" by Marcoe to establish a relationship with the children that are of the sort we have previously found to constitute abandonment.[35]

Also, like the district court, we view the evidence of Marcoe's conduct after his release from prison in August 2024 to be consistent with abandonment. The record shows that while Marcoe was released from prison in August 2024, he did not obtain a negative hair follicle test until December 19, 2024, he did not obtain Sunde's current telephone number from the children's school until "the end of 2024," and he did not pay any child support until February 2025.

Having determined that there was clear and convincing evidence of a ground to terminate under § 43-292(1), we need not consider whether the other grounds to terminate alleged in Sunde's complaint were also present.[36] Instead, we turn to the question of whether there was clear and convincing evidence that termination of Marcoe's parental rights was in the children's best interests.

---

[35] *Id*. at 330, 855 N.W.2d at 375. See, also, *In re Interest of Isabel P. et al., supra* note 26, 293 Neb. at 80, 875 N.W.2d at 861 ("minimal contact" and "significant gaps" between father's visits over 22-month period); *In re Interest of Justine J. & Sylissa J.*, 288 Neb. 607, 849 N.W.2d 509 (2014) (no evidence of contact over 11-month period other than unauthorized visit and occasional messages on social media); *Kenneth C., supra* note 28 (father's attempts to establish contact with child, if made, were unsubstantial).

[36] See *Wayne G. v. Jacqueline W.*, 288 Neb. 262, 847 N.W.2d 85 (2014).

### (b) Whether Termination Was in
### Children's Best Interests

[8] Whereas the statutory grounds for termination of parental rights are based on a parent's past conduct, the best interests inquiry focuses on the future well-being of the child.[37] "'While proof of the former will often bear on the latter, a court may not simply assume that the existence of a statutory ground for termination necessarily means that termination would be in the best interests of the child.'"[38]

[9-11] Showing that termination of parental rights is in the best interests of the child is necessarily a particularly high bar, since a parent's right to raise his or her children is constitutionally protected.[39] The Due Process Clause of the U.S. Constitution would be offended if a state were to attempt to force the breakup of a natural family, over the objections of the parents and their children, without some showing of unfitness.[40] Accordingly, there is a rebuttable presumption that it is in the child's best interests to share a relationship with his or her parent.[41] That presumption can only be overcome by a showing that the parent is either unfit to perform the duties imposed by the relationship or has forfeited that right.[42]

[12-14] Although the term "unfitness" is not expressly stated in § 43-292, it derives from the fault and neglect subsections of that statute and from an assessment of the child's best interests.[43] Parental unfitness means a personal deficiency or incapacity that has prevented, or will probably prevent, performance of a reasonable parental obligation in child rearing

---

[37] *In re Interest of Joel T. et al., ante* p. 106, 32 N.W.3d 640 (2026).

[38] *Benjamin S., supra* note 6, 313 Neb. at 812, 986 N.W.2d at 501 (quoting *Kenneth C., supra* note 28).

[39] *In re Interest of Mateo L. et al.*, 309 Neb. 565, 961 N.W.2d 516 (2021).

[40] *Id*.

[41] *Id*.

[42] *Id*.

[43] *Id*.

and that has caused, or probably will result in, detriment to a child's well-being.[44] The best interests and parental unfitness analyses in the context of a termination of parental rights case require separate, fact-intensive inquiries, but each examines essentially the same underlying facts.[45]

We again agree with Sunde that under the record before us, the district court did not err in concluding that there was clear and convincing evidence that termination was in the children's best interests. In arguing otherwise, Marcoe points to evidence showing that he made efforts to contact the children before and after his imprisonment, that he "grew significantly" while in prison,[46] and that he was "committed to reestablishing a relationship with his children."[47] He argues that this evidence shows that he, like the father in *Morse v. Olmer*,[48] cannot be seen as unfit. Marcoe also argues that the "only evidence" that termination was in the children's best interests was Sunde's testimony expressing concerns about his past drug use and criminal behavior and the daughter's testimony allegedly "mirror[ing] [Sunde's] concerns."[49]

As Marcoe notes, there are certain similarities between his case and *Morse* and related cases. For example, there was evidence that Marcoe made personal improvements while in prison[50] and that at the time of the trial, he was employed, participated in therapy, took medication for his mental illnesses, did not presently use drugs and alcohol, and expressed an interest in parenting his children.[51] However, Marcoe ignores

---

[44] *Id*.

[45] *Id*.

[46] Brief for appellant at 29.

[47] *Id*.

[48] *Morse v. Olmer*, No. A-23-1028, 2024 WL 5220687 (Neb. App. Dec. 26, 2024) (selected for posting to court website).

[49] Brief for appellant at 30.

[50] See, e.g., *Benjamin S., supra* note 6; *Morse, supra* note 48.

[51] See, e.g., *Benjamin S., supra* note 6.

the more fundamental ways in which his case differs from *Morse* and related cases.

One such factor was the recency of Marcoe's sobriety, which left open questions about its permanency, particularly given the evidence that he had previously completed rehabilitation at least once before and relapsed after 18 months. Marcoe also has an extensive criminal history,[52] and while Marcoe may intend us to attribute that entire history to his substance abuse, there was no direct evidence to show that many of his convictions were tied to his consumption of drugs or alcohol. Marcoe's criminal history is troubling because the nature and number of offenses reflect a disrespect of the law, and the parties' daughter testified that she was concerned about his criminal history and had personally seen him flee from law enforcement. Also, unlike in *Morse*, there was no evidence that Marcoe ever had significant involvement in the children's lives. To the contrary, the evidence showed that even before the paternity decree was entered in 2018, Marcoe was "[a]bsent" and "relie[d] heavily" on his parents to care for the children during his parenting time. There was also evidence, as discussed above, that after the decree was entered, he was a sporadic presence in the children's lives.

Further, unlike in *Morse* and related cases,[53] there was evidence that there was no beneficial relationship between Marcoe and the children and no desire on the part of the children to see Marcoe.[54] Sunde testified that the parties' son was 3 years old when he last saw Marcoe and that he did not want to talk to Marcoe. The parties' daughter testified similarly to the absence of a beneficial relationship with Marcoe and her desire not to see him again. There was also evidence that the

---

[52] See, e.g., *In re Interest of Isabel P. et al., supra* note 26; *In re Interest of R.T. & A.T., supra* note 32.

[53] See, e.g., *Benjamin S., supra* note 6; *In re Interest of Justine J. & Sylissa J., supra* note 35; *Kenneth C., supra* note 28; *Morse, supra* note 48.

[54] Compare *In re Interest of Justin H. et al.*, 18 Neb. App. 718, 791 N.W.2d 765 (2010), with *In re Interest of R.T. & A.T., supra* note 32.

children had bonded with Sunde's husband and viewed him as their father,[55] and there were no grounds for concern as to the children's remaining in the custody of Sunde and her husband.[56] Marcoe would have us discount the daughter's testimony because it lacked "specific examples," and "[t]here [was] nothing in the record to indicate that [she] had sound reasoning . . . ."[57] However, the daughter gave several specific examples, and Nebraska courts have elsewhere relied upon the statements of much younger children in concluding that there was a beneficial relationship between parent and child.[58]

We also reject any suggestion that when a child is in a parent's custody and not in foster care, the other parent should be given extra leeway to rehabilitate himself or herself before his or her parental rights are terminated. While we have previously said that the issue is not of the "same magnitude" in cases where a child is in a parent's custody,[59] we do not understand this to mean that such a child should be made to await uncertain parental maturity when a parent is unable or unwilling to rehabilitate himself or herself within a reasonable time.[60]

### (c) Failure to Modify Custody in Lieu of Termination

Marcoe further claims that as an alternative to termination, the district court should have modified custody to allow him to rebuild his relationship with the parties' children through therapeutic parenting time. Marcoe argues that such a modification was within the court's "equity power"[61] and would

---

[55] Compare *Benjamin S., supra* note 6, with *In re Interest of R.T. & A.T., supra* note 32.

[56] *Benjamin S., supra* note 6.

[57] Brief for appellant at 30.

[58] See, e.g., *Morse, supra* note 48.

[59] *Kenneth C., supra* note 28, 286 Neb. at 812, 839 N.W.2d at 315.

[60] See *In re Interest of Bosileo D. et al., ante* p. 490, 35 N.W.3d 434 (2026).

[61] Brief for appellant at 31.

have allowed him to "show his current parental fitness" and demonstrate that he had changed and "was not going to return to his old habits."[62]

We disagree. Even assuming that modification would have been proper absent a complaint or other pleading seeking modification, the district court cannot be seen to have erred in not modifying custody, in lieu of terminating Marcoe's parental rights, where there was clear and convincing evidence that there were grounds for termination and that termination was in the best interests of the children.

### 3. Vacating Marcoe's Request for Contempt Citation Against Sunde

Finally, Marcoe claims that the district court erred in concluding that he failed to meet his burden to prove that Sunde was in contempt for not providing him with any way to contact the children and not allowing him to have weekly telephone or video chat communication with the children and resume in-person visitation after he provided a negative hair follicle test. Marcoe points to Sunde's own testimony that she did not give Marcoe her new telephone number and that she refused to allow him to have any contact with the children even after he produced a negative hair follicle test. Relatedly, Marcoe claims that under Neb. Rev. Stat. § 42-364.15(1) (Reissue 2016), the court should have entered an order modifying custody, instead of terminating his parental rights, as noted above.

We conclude that the issue of the requested contempt citation is moot insofar as we affirm the district court's order terminating Marcoe's parental rights. A termination of parental rights is a final and complete severance of the child from the parent and removes the entire bundle of parental rights.[63]

---

[62] *Id*. at 32.

[63] *In re Interest of Amber G. et al.*, 250 Neb. 973, 554 N.W.2d 142 (1996), *disapproved on other grounds, In re Interest of Lilly S. & Vincent S.*, 298 Neb. 306, 903 N.W.2d 651 (2017); *In re Interest of Giavonna G.*, 23 Neb. App. 853, 876 N.W.2d 422 (2016).

Accordingly, Marcoe no longer has the requisite personal interest in the resolution of the disputes over the enforcement of the prior custody orders that existed at the beginning of the litigation.[64]

## VI. CONCLUSION

Marcoe's various claims about the district court's handling of Sunde's complaint to terminate his parental rights and his own request for a contempt citation against Sunde are meritless or moot. As such, we affirm the order of the district court.

AFFIRMED.

---

[64] See, e.g., *Burbank v. Evnen, ante* p. 65, 32 N.W.3d 612 (2026).